**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jodeci Vanorden, et al., | No. CV-24-01060-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| ECP Optometry Services LLC, et al., | |
| Defendants. | |

Pending before the Court is a motion for conditional certification ("the preliminary certification motion")[1] of a collective action under the Fair Labor Standards Act ("FLSA") filed by Plaintiffs Jodeci "Jodi" Vanorden ("Vanorden") and Gabriella Gantt ("Gantt") (together, "Plaintiffs"). (Doc. 17.) For the reasons that follow, the motion is granted.

**BACKGROUND**

On May 8, 2024, Plaintiffs filed this FLSA action against Defendants ECP Optometry Services, LLC ("ECP") and Eyecare Partners LLC ("Eyecare") (together, "Defendants"). (Doc. 1.)

On June 17, 2024, Plaintiffs filed the First Amended Complaint ("FAC"), which is the operative complaint. (Doc. 14.) The facts alleged are as follows. From early 2023 until April 2024, Defendants employed Plaintiffs as non-exempt, full-time employees of Defendants' optometrist offices. (*Id.* ¶¶ 1, 10-24, 35, 84.) Plaintiffs "routinely worked off

---

[1]    Courts in the Ninth Circuit use the terms "conditional certification" and "preliminary certification" interchangeably.

the clock" and were "not compensated anything for those overtime hours." (*Id.* ¶¶ 44, 47.) Defendants "were aware that Plaintiffs' working hours routinely exceeded 40 hours" and "required Plaintiffs to work off the clock overtime as a condition of their employment." (*Id.* ¶¶ 56-57.)  Plaintiffs allege that other employes "were not fully compensated for their off-the-clock overtime wages," that the "experiences of Plaintiffs, with respect to their pay, are typical of the experiences" of other employees, and that "Defendants' failure to pay off the clock overtime compensation required by the FLSA results from generally applicable policies or practices and does not depend on the [employees'] personal circumstances." (*Id.* ¶¶ 2, 74-78.)  As such, Plaintiffs bring this action on behalf of themselves and a proposed collective:

> All employees who work[ed] for Defendants ECP Optometry Services, LLC and/or Eyecare Partners, LLC; within the past three years; who work[ed] over 40 hours in any given workweek as a past or present employee; who worked on an hourly basis; who did not receive overtime compensation for their off the clock work are known as (the "Collective Members").

(*Id.* ¶ 65.)

On July 11, 2024, Plaintiffs filed the preliminary certification motion.  (Doc. 17.)

On July 15, 2024, Defendants filed an answer to the FAC.  (Doc.  18.)

On July 25, 2024, August 5, 2024, and August 26, 2024, Defendants filed unopposed motions to extend the deadline to respond to the preliminary certification motion (Docs. 20, 22, 30), each of which was granted (Docs. 21, 23, 31).

On September 12, 2024, Defendants responded to the preliminary certification motion.  (Doc. 34.)[2]

On September 19, 2024, Plaintiffs filed a reply.  (Doc. 36.)

…

…

…

---

[2]    Defendants' request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process.  *See* LRCiv 7.2(f).  Additionally, for the reasons discussed in more detail *infra*, the Court is hesitant to inject further delay into the resolution of the preliminary certification request.

**DISCUSSION**

I.    <u>Legal Standard</u>

The FLSA provides "similarly situated" employees with the "right" to bring a collective action against their employer:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.  No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought. . . .  The right . . . to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor . . . .

29 U.S.C. § 216(b).

The seminal Ninth Circuit case regarding FLSA collective actions is *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018).  In *Campbell*, the Ninth Circuit explained that, under § 216(b), "workers may litigate jointly if they (1) claim a violation of the FLSA, (2) are 'similarly situated,' and (3) affirmatively opt in to the joint litigation, in writing." *Id.* at 1100.  The court further explained that this right "has two permutations": (1) "[t]he right . . . to bring an action by or on behalf of any employee"; and (2) "the right of any employee to become a party plaintiff to any such action"—"that is, the right to bring the collective litigation and the right to join it." *Id.*

Turning to the procedures and standards governing FLSA collective actions, *Campbell* noted that a judicially-crafted "two-step 'certification' process" had become "near-universal" and therefore chose to "adhere" to the terms "preliminary certification" and "decertification" in the FLSA context because they are "widespread," with the caveat that adherence to this terminology does not "imply that there should be any particular procedural parallels between collective and class actions." *Id.* at 1100-02.  The court further clarified that, under the two-step certification process, "plaintiffs will, at some point around the pleading stage, move for 'preliminary certification' of the collective action, contending that they have at least facially satisfied the 'similarly situated' requirement," and then "[l]ater, after the necessary discovery is complete, defendants will move for

'decertification' of the collective action on the theory that the plaintiffs' status as 'similarly situated' was not borne out by the fully developed record." *Id.* at 1100. Although the court acknowledged that both steps involve evaluating whether the plaintiffs are "similarly situated," it emphasized that different standards apply at each step:

> Preliminary certification, as noted, refers to the dissemination of notice to putative collective members, conditioned on a preliminary determination that the collective as defined in the complaint satisfies the "similarly situated" requirement of section 216(b). At this early stage of the litigation, the district court's analysis is typically focused on a review of the pleadings but may sometimes be supplemented by declarations or limited other evidence. The level of consideration is "lenient"—sometimes articulated as requiring "substantial allegations," sometimes as turning on a "reasonable basis," but in any event loosely akin to a plausibility standard, commensurate with the stage of the proceedings.
>
> [ . . . ]
>
> Assuming the collective action has survived its earlier scrutiny, the second stage will come at or after the close of relevant discovery. The employer can move for "decertification" of the collective action for failure to satisfy the "similarly situated" requirement in light of the evidence produced to that point. The district court will then take a more exacting look at the plaintiffs' allegations and the record. Because of its purpose and timing, decertification can resemble a motion for partial summary judgment on the "similarly situated" question, and may be combined with cross-motions for summary judgment.

*Id.* at 1109-10 (cleaned up). The court noted that "the two-step process . . . has the advantage of ensuring early notice of plausible collective actions, then eliminating those whose promise is not borne out by the record." *Id.* at 1110.

In *Campbell*, a decertification motion was at issue, so the "more exacting" summary-judgment-like standard applied, as opposed to the "lenient" plausibility-like standard that applies to a preliminary certification motion. Nevertheless, because certification and decertification motions both ask the district court to consider whether the plaintiffs are "similarly situated," the discussion in *Campbell* of the meaning of that statutory term is relevant for both steps in the two-step process.

*Campbell* rejected the two prevailing approaches to the "similarly situated" requirement that had emerged up to that point. The first rejected approach, dubbed the "minority approach," would require FLSA collectives "to satisfy the [Rule 23]

1    requirements of numerosity, commonality, typicality, adequacy, predominance, and

2    superiority." *Id.* at 1111.  The court concluded that this approach was flawed because it

3    "rests improperly on an analogy to Rule 23 lacking in support in either the FLSA or the

4    Federal Rules of Civil Procedure," imports "rules specific to class actions [which] have

5    evolved to protect the due process rights of absent class members, a consideration not

6    pertinent under the post-1947 FLSA," and fails to take into account the "lower bar" for

7    FLSA collective actions, to which employees have a statutory "right." *Id.* at 1112-13.  The

8    second rejected approach, dubbed the "majority approach" or "ad hoc test," would require

9    district courts to "appl[y] a three-prong test that focuses on points of potential factual or

10    legal *dissimilarity* between party plaintiffs" by first considering the "disparate factual and

11    employment settings of the individual plaintiffs," then considering the "various defenses

12    available to defendants which appear to be individual to each plaintiff," and finally

13    considering "fairness and procedural considerations." *Id.* at 1113.  The court identified

14    "two major flaws" with this approach: (1) it "offers no clue as to what *kinds* of 'similarity'

15    matter under the FLSA," such that "[i]t is, in effect, a balancing test with no fulcrum"; and

16    (2) the "fairness and procedural considerations" prong "invites courts to import, through a

17    back door, requirements with no application to the FLSA—for example, the Rule 23(b)(3)

18    requirements of adequacy of representation, superiority of the group litigation mechanism,

19    or predominance of common questions." *Id.* at 1114-15.

20        Having rejected both prevailing approaches, the Court articulated the following

21    definition of "similarly situated" (for FLSA purposes) that courts within the Ninth Circuit

22    must employ:

23        [P]arty plaintiffs must be alike with regard to some *material* aspect of their
         litigation.  That is, the FLSA requires similarity of the kind that allows
24        plaintiffs the advantage of lower individual costs to vindicate rights by the
         pooling of resources.  That goal is only achieved—and, therefore, a collective
25        can only be maintained—to the extent party plaintiffs are alike in ways that
         matter to the disposition of their FLSA claims.  If the party plaintiffs' factual
26        or legal similarities *are* material to the resolution of their case, dissimilarities
         in other respects should not defeat collective treatment.

27

28    *Id.* at 1114 (cleaned up).  Put another way, "[p]arty plaintiffs are similarly situated, and

1    may proceed in a collective, to the extent they share a similar issue of law or fact material

2    to the disposition of their FLSA claims." *Id.* at 1117.   "[D]ifference" is not

3    "disqualifying"—rather, "the requisite kind of similarity" is the "basis for allowing

4    partially distinct cases to proceed together." *Id.*

5           Under this definition, the members of an FLSA collective do not need to have

6    "overall sameness." *Id.* at 1116.  For example, in *Campbell*, it was enough for the plaintiffs

7    to demonstrate that they were subject to the same "overall policy" regardless of whether

8    they "worked on different tasks, in different divisions, and under different supervisors"

9    because "[a] systemic policy is no less common across the collective if those subject to it

10   are affected at different times, at different places, in different ways, or to different degrees."

11   *Id.*  In that case, "[t]he district court emphasized also that the [plaintiffs] worked different

12   hours and claimed overtime of different amounts, including some amounts that might have

13   been de minimis," but the Ninth Circuit stated that "those distinctions go to the

14   individualized calculation of damages or the individualized application of defenses" and

15   "do not preclude collective treatment for the purpose of resolving the common issue that

16   *does* exist, and that must be answered in the first instance." *Id.*  The court elaborated that

17   "individualized damages calculations" are not "inherently inconsistent with a collective

18   action" because "if a common question regarding the employer's liability is answered in

19   the plaintiffs' favor, individualized calculations of work hours may readily be addressed

20   with any of the practices developed to deal with Rule 23 classes facing similar issues." *Id.*

21   Considering that the "amount of damages is invariably an individual question and does not

22   defeat class action treatment" in the Rule 23 context, the court held that "[i]ndividual

23   damages amounts cannot defeat collective treatment under the more forgiving standard of

24   section 216(b) either." *Id.* at 1117.

25          Finally, the court clarified that "the FLSA does not give district courts discretion to

26   reject collectives that meet the statute's few, enumerated requirements." *Id.* at 1115.  "As

27   is true in all FLSA cases," the "background principle" is that "because the FLSA is a

28   remedial statute, it must be interpreted broadly."  *Senne v. Kansas City Royals Baseball*

1    *Corp.*, 934 F.3d 918, 950 (9th Cir. 2019) (citation omitted).  "The 'similarly situated'

2    standard at [the conditional certification] phase is fairly lenient and typically results in

3    certification."  *Roberts v. Sidwell Air Freight Inc.*, 2022 WL 16949565, *8 (W.D. Wash.

4    2022) (quotation omitted).

5    II.    <u>The Parties' Arguments</u>

6        A.    **The Motion**

7        Plaintiffs argue that "Defendants instituted a company-wide practice to deprive

8    Plaintiffs and other similar employees of their off-the-clock worked overtime wages" (Doc.

9    17 at 12) and submit evidence in support of this claim in the form of Plaintiffs' declarations.

10    (Docs. 17-1, 17-2.)

11        Plaintiff Vanorden declares as follows.  Throughout her employment, Vanorden was

12    required to work hours off the clock and was not paid for those hours.  (Doc. 17-1 ¶¶ 6-7.)

13    Vanorden was assigned "an extensive amount of work" and needed to work "late hours

14    with [an] extensive amount of overtime to get the work done" such that she "regularly and

15    consistently worked more than 60 hours in a given workweek" but was "not compensated

16    for these overtime hours."  (*Id.* ¶¶ 9, 15.)  Vanorden's supervisor, Haley Collins

17    ("Collins"), ordered Vanorden to "mimic" Collins's timecard—that is, to "log into

18    [Collins's] account" and "duplicate her timecard" so that Vanorden's recorded time would

19    "reflect the same hours" as those hours recorded by Collins.  (*Id.* ¶¶ 8, 16-17.)  Although

20    Vanorden worked significant overtime and witnessed Collins working "a similar

21    schedule," Collins did not record her own overtime and instructed Vanorden not to include

22    overtime on her timecard either, subject to a few exceptions—for example, Vanorden was

23    "allowed to record overtime" when the office was "extremely short staffed and needed the

24    coverage," when she was required to come in on her "day off" to participate in a "leadership

25    meeting," or when "Collins was out of the office on PTO."  (*Id.* ¶¶ 8, 18-19.)  In April

26    2023, Vanorden "had a discussion with [Collins] about overtime not being paid" and

27    Collins shared a "secret"—that when Collins held Vanorden's job, Collins was allowed to

28    keep a record of her overtime hours "in a separate spreadsheet" and was given paid time

off "instead of overtime." (*Id.* ¶¶ 10-11.) Vanorden "regularly" heard employees discussing unpaid overtime, such as working "through lunch" and having to "clock out and not get paid for it." (*Id.* ¶ 24.) Vanorden contends there was "an official position from management, that if you record overtime on your timecard, you will get written up," but "employees would also get written up if they did not get their work completed," so employees needed to "clock out and continue working" to avoid getting written up. (*Id.* ¶ 25.) Early on in her employment, Vanorden "spoke with various employees," whose names she cannot recall, "who stated they were being compensated in the same manner that [Vanorden] was" and "had not been told how [their] regular rate and overtime were calculated" and shared her concern that they "were not being compensated properly for overtime hours worked." (*Id.* ¶ 26.)

Plaintiff Gantt declares as follows. Throughout her employment, Gantt "was required to work hours off the clock" and "was not paid for those hours." (Doc. 17-2 ¶¶ 6-7.) Gantt "regularly and consistently worked more than 50 hours in a given workweek," including "around ten off the clock hours per week" throughout "the entire term of [her] employment," but when she asked Collins about overtime, Collins told Gantt "we're not allowed to do overtime" and directed her to "try to do only an hour of overtime," despite knowing that Gantt "was running three offices." (*Id.* ¶¶ 15, 19, 21.) Sometimes Gantt "had to work full days on the weekends and not get compensated." (*Id.* ¶ 20.) Gantt spoke with a coworker, Diane Flores ("Flores"), about "not being paid the correct overtime rate, not being provided with the proper tools to do our job, and tasks taking much longer than [her] managers and supervisors expected," and Flores stated that "she was paid the exact same way." (*Id.* ¶ 9.) On several occasions, Gantt "discussed the overtime payment with fellow employees [Flores] (assigned to the Queen Creek office) in or around July 2023; Christopher Morgante (assigned to the Queen Creek office) in or around July 2023; Adrian Lin (assigned to the Queen Creek office) in or around October 2023; and [Vanorden] (assigned to the Tempe office) in or around July 2023," and these employees "stated they were being compensated in the same manner" and discussed that they "were not being

compensated properly for overtime hours worked." (*Id.* ¶¶ 22-23.)

Plaintiffs also attach a proposed notice and consent form. (Doc. 17-3.)

B.     **The Response**

First, Defendants argue that "this Court may not exercise specific personal jurisdiction over any putative collective member not employed in Arizona because the claims of any out-of-state plaintiffs do not, indeed cannot, arise out of those Defendants' activities in Arizona," so "to the extent Plaintiffs' request is to send a notice nationwide . . . , such a request is improper and should be denied." (Doc. 34 at 3-10.)

Second, Defendants argue that the Court should apply the legal standard for preliminary certification endorsed by the Fifth and Sixth Circuits rather than the standard discussed in *Campbell*. (*Id.* at 10-14.)

Third, Defendants argue that "Plaintiffs make no effort to show through job descriptions, job duties, or other reliable means that they were similarly situated to other past or present district leaders, office managers, opticians, or front desk employees" and that Plaintiffs' declarations are "self-serving" and "rely on hearsay." (*Id.* at 14-17.)

Fourth, Defendants argue that Plaintiffs have "misconstrued" Defendants' policy, which is actually "an informal rule of thumb advising employees to notify their district manager if overtime exceeds one hour, either via a phone call, email, or text message" and that there is no "policy limiting overtime to one hour." (*Id.* at 17.) Defendants assert that "EyeCare Partners does not restrict overtime to specific scenarios."[3] (*Id.*)

Fifth, Defendants argue that there is no "basis for the Court to equitably toll the statute of limitations in this case" aside from "Plaintiffs' desire to subvert the reasoning underlying all statutes of limitation." (*Id.* at 20-21.)[4]

Sixth, Defendants argue that the Court "should direct the parties to meet and confer

---

[3]     In a footnote, Defendants assert that "Eyecare Partners, LLC is not an employing entity or an employer under statutory definitions and did not employ Plaintiffs at any time relevant hereto." (Doc. 34 at 1 n.1.)

[4]     Defendants' response brief exceeds the 17-page limitation, LRCiv 7.2(e)(1), and Defendants did not seek and obtain leave to file an oversized brief. Nevertheless, as a courtesy, the Court will consider all of Defendants' arguments.

1    on a form of notice and claim form rather than accept the proposed forms submitted by

2    Plaintiffs with no input by Defendants."  (*Id.* at 22.)

3            Seventh, Defendants "object to providing contact information to Plaintiffs' counsel

4    and request[]that a third-party administrator be utilized to send any notice."  (*Id.*)

5            Defendants attach declarations to support their assertions of fact.  (Doc. 34-1)

6        C.    **The Reply**

7            In reply, Plaintiffs argue that (1) the Court has personal jurisdiction over non-

8    resident opt-in plaintiffs (Doc. 36 at 1-6); (2) the Court should "follow Ninth Circuit

9    precedent" (*id.* at 6-7); (3) Plaintiffs "provided sufficient evidence" that the members of

10   the collective are similarly situated (*id.* at 7-9); (4) Defendants' controverting evidence is

11   self-serving, relies on hearsay, and lacks "corresponding records evincing their reliability"

12   (*id.* at 8); (5) although Plaintiffs did not oppose Defendants' three requests to extend their

13   response deadline "because of professional courtesy," the "delay of two months when

14   added to the time necessary for a decision to be rendered weighs heavily against opt-in

15   plaintiffs in being able to obtain redress of their rights," such that equitable tolling is

16   appropriate here (*id.* at 9-10); and (6) "Defendants did not respond to the Notice portion of

17   the motion, and therefore, it should be deemed as consented to" (*id.* at 10-11).

18   III.   <u>Analysis</u>

19       A.    **Identifying The Applicable Preliminary-Certification Standard**

20           A threshold issue raised in the parties' briefing is whether the Court should apply

21   the preliminary-certification standard discussed in *Campbell* and or the preliminary-

22   certification standards adopted by the Fifth Circuit in *Swales v. KLLM Transportation

23   Services, L.L.C.*, 985 F.3d 430 (5th Cir. 2021), and the Sixth Circuit in *Clark v. A&L

24   Homecare and Training Center, LLC*, 68 F.4th 1003 (6th Cir. 2023).

25           This issue does not present a close call.  "District courts are bound by the law of

26   their own circuit."  *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981).  The

27   Ninth Circuit has stated that the determination of "whether to conditionally certify an FLSA

28   collective action" should be made "in accordance with our precedent," citing *Campbell*.

*Tijerino v. Stetson Desert Project, LLC*, 934 F.3d 968, 976 (9th Cir. 2019).  *See also Senne*, 934 F.3d at 947 ("We recently delineated the appropriate standard for FLSA collective certification in *Campbell*.").  It follows that *Campbell* is binding here.

To the extent Defendants argue that *Campbell*'s articulation of the applicable preliminary-certification standard "is dicta" (Doc. 34 at 3), not only is that characterization of *Campbell* incorrect for the reasons discussed above, but the disputed passages of *Campbell* would remain binding here even if they could be characterized as dicta.  Under Ninth Circuit law, "[w]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.  In other words, well-reasoned dicta is the law of the circuit, but we are not bound by a prior panel's comments made casually and without analysis, uttered in passing without due consideration of the alternatives, or done as a prelude to another legal issue that commands the panel's full attention."  *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) (cleaned up).

For these reasons, the Court joins the many other district courts within the Ninth Circuit that have declined invitations to abandon *Campbell* in favor of Fifth and Sixth Circuit law.  *See, e.g., Harrington v. Cracker Barrel Old Country Store Inc.*, 713 F. Supp. 3d 568, 586 (D. Ariz. 2024) ("*Swales* has no binding effect on the Ninth Circuit.); *Hubbard v. Cnty. of Los Angeles*, 2024 WL 3273495, *4 (C.D. Cal. 2024) ("[T]he Sixth Circuit's 'strong likelihood' standard [set forth in *Clark*] differs from the more lenient standard applied in the Ninth Circuit."); *Kiani v. Automatic Data Processing Inc.*, 2024 WL 2831628, *3 (D. Ariz. 2024) ("ADP asserts that the two-step approach has no basis in the FLSA's statutory language and has been rejected by the Fifth Circuit in [*Swales*] and the Sixth Circuit in [*Clark*].  The Ninth Circuit, however, endorsed the two-step approach in *Campbell*."); *Park v. Unum Grp. Corp.*, 2022 WL 17251964, *2 (C.D. Cal. 2022) ("The Ninth Circuit endorses a two-step certification process, and this Court is bound to follow it."); *id.* *3 (collecting cases); *Kurtz v. RCCH Trios Health, LLC*, 2021 WL 6246626, *2

n.1 (E.D. Wash. 2021) ("[T]he *Swales* approach conflicts with the two-stage certification process approved by the Ninth Circuit in *Campbell*."); *Hunter v. Legacy Health*, 2021 WL 4238991, *11 (D. Or. 2021) ("The Ninth Circuit, however, has clearly spoken on the point . . . .");

B.    **Personal Jurisdiction**

There are currently two Plaintiffs in this collective action. Defendants admit in their answer that they are subject to the Court's personal jurisdiction in relation to those Plaintiffs' claims and that venue in the District of Arizona is proper as to those claims. (Doc. 18 ¶¶ 7-8.) However, Defendants argue that the Court must undertake a personal-jurisdiction analysis as a way of winnowing down the list of other potential opt-in plaintiffs who may receive notice that this action exists.

Defendants rely on *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255 (2017), a case that addressed the Fourteenth Amendment "due process limits on the exercise of specific jurisdiction by a State" in the context of a mass tort action and expressly "[left] open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." *Id.* at 268-69. The question left open is a tricky one—the circuit courts that have tackled the issue are divided in their approaches, and in the absence of any precedent from the Ninth Circuit, district courts within this circuit are likewise split. *See, e.g.*, *Gilburd v. Rocket Mortg. LLC*, 2023 WL 8480062, *5 (D. Ariz. 2023) ("In the years since *Bristol-Myers*, however, district and circuit courts have split on whether *Bristol-Myers* applies to FLSA collective action claims. At present, the Ninth Circuit has not addressed the issue. Although some district courts within the Ninth Circuit have dismissed FLSA claims of employees who cannot establish a connection between their claims and the forum, most have rejected applying *Bristol-Myers* to collective actions arising under the FLSA.") (cleaned up); *Gillespie v. Cracker Barrel Old Country Store Inc.*, 2023 WL 2734459, *12 n.13 (D. Ariz. 2023) ("[F]our Ninth Circuit district courts have applied *Bristol-Myers* to FLSA collective actions while at least seven have held the opposite.") (cleaned up).

The proper time to take up this complicated issue would be if and when any additional members of the collective attempt to opt in and Defendants believe that personal jurisdiction is lacking as to those new opt-in plaintiffs' claims. But as of now, Defendants only raise the possibility that jurisdiction would be lacking in relation to claims raised by hypothetical plaintiffs-to-be. "Under the FLSA, . . . 'conditional certification' does not produce a class with an independent legal status, or join additional parties to the action. The sole consequence of conditional certification is the sending of court-approved written notice to employees, who in turn become parties to a collective action only by filing written consent with the court." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013) (cleaned up). If notice is sent nationwide and non-Arizona opt-in plaintiffs then attempt to join this collective action, Defendants may have a personal jurisdiction argument to make at that time, and if Defendants file a motion based upon such an argument, those non-Arizona opt-in plaintiffs will have the opportunity to defend their right to remain in the collective action.

Under Ninth Circuit law, the Court does not focus on "points of potential factual or legal *dissimilarity* between party plaintiffs" when deciding whether to grant a preliminary certification request. *Campbell*, 903 F.3d at 1113. Rather, "[p]arty plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Id.* at 1117. The personal jurisdiction issue raised by Defendants is a potential legal dissimilarity between collective members, but it does not preclude the possibility that the members of the collective also share a similar material issue of law or fact. Thus, the jurisdictional issue is not yet ripe. The standard for preliminary certification under *Campbell* only requires that the members of the collective share a common material issue of fact or law. The Court will limit itself to that analysis.

## C.     Preliminary Certification—Merits

Defendants argue that Plaintiffs have failed to submit "objective evidence" to prove their similarity, asserting that Plaintiffs' declarations are "self-serving" and "rely on

hearsay." (Doc. 34 at 15.) But objective evidence is not required here. A preliminary certification motion—much like a Rule 12(b)(6) motion to dismiss—is typically filed "at some point around the pleading stage" and is "focused on a review of the pleadings" using a standard "loosely akin to a plausibility standard, commensurate with the [early] stage of the proceedings." *Campbell*, 903 F.3d at 1109-10. Although the analysis "may sometimes be supplemented by declarations or limited other evidence," such evidence is not necessary. *Id.*

When such evidence is submitted, it is frequently in the form of declarations from the named Plaintiffs—indeed, in the Court's experience, this is almost always the case. Defendants' hearsay challenge is undeveloped, but it appears that Defendants object to the Plaintiffs' assertion that the requirement to do off-the-clock work was a regular topic of conversation among Plaintiffs and their coworkers. (Doc. 34 at 15-16.) "The caselaw is not clear on whether evidence must be admissible at the conditional certification stage of a FLSA action," *Fernandez v. Tox Corp.*, 677 F. Supp. 3d 1089, 1097 n.2 (C.D. Cal. 2023), and the briefing on this issue is cursory, at best. At any rate, preliminary certification would be warranted here even if the only specific assertion that Defendants challenge as hearsay—Vanorden's assertion that she "regularly heard statements like '[so and so] would have to work through lunch and clock out and not get paid for it" (Doc. 17-1 ¶ 24; Doc. 34 at 15)—were disregarded. When the specific, non-conclusory allegations in the FAC and the non-hearsay portions of Plaintiffs' declarations are considered together, Plaintiffs have done enough to plausibly establish that the collective members were subjected to the same systemic practice and thus "share a similar issue of law or fact material to the disposition of their FLSA claim." *Campbell,* 903 F.3d at 1117. For example, Plaintiffs' assertions as to what Collins told them are not hearsay. Fed. R. Evid. 801(d)(2).

Meanwhile, although courts arguably "*need not even consider* evidence provided by defendants at this stage," *Luque v. AT & T Corp.*, 2010 WL 4807088, *3 (N.D. Cal. 2010), the arguments and declarations offered by Defendants underscore that the members of the collective share a similar issue of material fact. Indeed, Defendants argue that they

have "an informal rule of thumb advising employees to notify their district manager if overtime exceeds one hour, either via a phone call, email, or text message," but that this is "a flexible guideline" that has been "misconstrued" as "limiting overtime to one hour." (Doc. 34 at 17.)  This is consistent with Plaintiffs' overarching allegation that this case involves a challenge to a "company-wide practice" that had the effect of depriving employees of overtime wages.  (Doc. 17 at 12.)

Defendants also offer a declaration from Stephanie Babcock ("Babcock"), Defendants' Regional Director, who asserts that the "Overtime Policy at EyeCare Partners requires pre-approval from the DM prior to working any anticipated overtime," that "[s]everal situations exist where pre-approval cannot be obtained but the DM should be notified of the overtime worked," that "Office Managers are responsible for reviewing timecards on a weekly basis to identify accrued overtime and reduce the staff members' hours to offset any habitual or extensive overtime hours," that "Office Managers, including Vanorden and Gantt, regularly review timecards to monitor office hours and flag and review habitual overtime to address the underlying cause, such as staffing shortages for example," and that "Babcock has a history of closing offices to control overtime costs and would have taken similar measures to address the alleged overtime by the Plaintiffs." (Doc. 34-1 at 16-17 ¶¶ 8-10.)  Likewise, Collins asserts in her declaration that "[s]hould an employee accumulate excessive overtime, EyeCare Partners instructed management to reduce their remaining scheduled hours to offset the need for overtime." (*Id.* at 9 ¶ 15.) Collins also declares that "[u]pper management stressed the importance of clocking out and taking lunch breaks, and Vanorden consistently reminded employees to do so.  Certain team members deliberately disobeyed this directive, and Collins communicated that a willful refusal to follow company policy may result in a conversation about potential corrective action." (*Id.* at 10 ¶ 16.)  Collins further declares that Gantt's "workload did not support working more than 50 hours in a given workweek." (*Id.* at 12 ¶ 26.)  But again, statements indicating that Defendants have a policy that strongly discourages overtime and a practice of making efforts to avoid employee overtime, including "closing offices,"

reducing "remaining scheduled hours," and "corrective action," underscore the existence of a disputed question of fact shared by the collective, *i.e.,* whether Defendants' policies encourage (or require) employees to work unpaid off-the-clock overtime.

Furthermore, Defendants have raised the argument that "Eyecare Partners, LLC is not an employing entity or an employer under statutory definitions and did not employ Plaintiffs at any time relevant hereto." (Doc. 34 at 1 n.1.)  The declaration of Christopher Feldmeir, Defendants' Senior Vice President and General Counsel, states that "ECP Optometry, a wholly owned subsidiary of EyeCare Partners, is the employer of record for the Plaintiffs." (Doc. 34-1 at 4 ¶ 7.)  But an argument that one of the Defendants is not a joint employer raises an additional material issue of law that the members of the collective share.  *See, e.g.*, *Castillo v. K.B. Wallworx Inc.*, 2023 WL 8002843, *5 (D. Ariz. 2023) (preliminary certification analysis "not difficult" where joint employment issue is a shared issue of law).

As for Defendants' argument that "Plaintiffs make no effort to show through job descriptions, job duties, or other reliable means that they were similarly situated to other past or present district leaders, office managers, opticians, or front desk employees" (Doc. 34 at 15), the problem with this argument is that, under *Campbell*, the members of an FLSA collective do not need to have "overall sameness."  *Campbell*, 903 F.3d at 1116.  As noted, in *Campbell*, it was enough for the plaintiffs to demonstrate that they were subject to the same "overall policy" regardless of whether they "worked on different tasks, in different divisions, and under different supervisors" because "[a] systemic policy is no less common across the collective if those subject to it are affected at different times, at different places, in different ways, or to different degrees."  *Id.*  Members of an FLSA collective action do not have to have the same job descriptions or job duties—"difference" is not "disqualifying."  *Id.* at 1117.

For these reasons, the Court concludes that the members of the collective are "similarly situated" for purposes of preliminary certification.

…

### D.   **Tolling Of The Statute Of Limitations**

The statute of limitations for FLSA actions provides that "every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued."  29 U.S.C. § 255(a).  In FLSA collective actions, the action is "considered to be commenced" as to opt-in plaintiffs on the date when their written consent to opt in is filed.  *Id.* § 256(b).

Nevertheless, "the FLSA does not bar the district court-imposed suspension of the statute of limitations" and "such tolling is supported by substantial policy reasons." *Partlow v. Jewish Orphans' Home of S. California, Inc.*, 645 F.2d 757, 761 (9th Cir. 1981), *abrogated on other grounds by Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989). Tolling can be appropriate even if the defendants have "done nothing wrong."  *Id.* at 760. *See also Ray v. California Dep't of Soc. Servs.*, 2019 WL 6888050, \*8 (C.D. Cal. 2019) ("[T]he Court does not need to find any fault on the part of the [defendant] in order to toll the statute of limitations.").  "Courts have equitably tolled the statute of limitations in [an] FLSA action when doing so is in the interest of justice."  *Castle v. Wells Fargo Fin., Inc.*, 2007 WL 1105118, \*1 (N.D. Cal. 2007).

Delay in the resolution of a motion for preliminary certification can justify equitable tolling.  *See, e.g., Harrington v. Cracker Barrel Old Country Store Inc.*, 713 F. Supp. 3d 568, 579 (D. Ariz. 2024) ("[D]elays beyond a plaintiff's control include the time a court requires to rule on a motion to certify a collective action under the FLSA."); *Begley v. JK Enter. Inc.*, 2022 WL 1609234, \*2 (D. Or. 2022) (equitable tolling appropriate where "the court's significant caseload delayed resolution" of preliminary certification motion by almost five months); *Winningham v. Rafeal's Gourmet Diner, LLC*, 2022 WL 18359485, \*2 (D. Or. 2022) ("[I]t is in the interest of justice to equitably toll the statute of limitations because the Court's docket management is out of Plaintiffs' control.  The time required for a court to rule on a motion for certification of a collective action in a FLSA case may be deemed an extraordinary circumstance justifying application of the equitable tolling

doctrine. Additionally, Defendants in this case would not be prejudiced by this tolling because Defendants knew the scope of potential liability at the time that Plaintiffs filed the Complaint. Thus, it is in the interests of justice to equitably toll the statute of limitations to eliminate any prejudice suffered by potential collective action members as a result of the delay in resolving the conditional certification motion.") (cleaned up); *Small v. Univ. Med. Ctr. of S. Nevada*, 2013 WL 3043454, *4 (D. Nev. 2013) ("The potential opt-in plaintiffs could be unfairly prejudiced by the court's [three month] delay in resolving the Motion.").[5]

The FLSA provides workers with a "right" to join a collective action, which allows those workers to "capitaliz[e] on efficiencies of scale." *Campbell*, 903 F.3d at 1100, 1105. Without "the opportunity to proceed collectively," *id.* at 1115, workers might not have the means or wherewithal to proceed at all. The Ninth Circuit has endorsed the "two-step" approach which "has the advantage of ensuring early notice of plausible collective actions." *Id.* at 1110. "A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity. These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). Because potential opt-in plaintiffs cannot join a collective action unless they have notice that it exists, a delay in providing early notice can result in workers having their claims barred by the statute of limitations.

On the other hand, "Congress knew when it enacted 29 U.S.C. § 256 that time would lapse between the filing of the collective action complaint by the named plaintiff and the filing of written consents by the opt-in plaintiffs, yet it chose not to provide for [automatic] tolling of the limitations period. Congress could have avoided the foreseeable delay of

---

[5]     *But see Baughman v. Roadrunner Commc'ns LLC*, 2012 WL 12937133, *5 (D. Ariz. 2012) ("While some courts have tolled the FLSA statute of limitations due to motions for certification remaining pending for an unusually long time, that is not the case here, as Plaintiff's motion has been ripe for decision only [for about two months].") (cleaned up).

good faith motions and judicial decision-making by patterning the statute of limitations for the FLSA after that of Rule 23 for class actions; however, they did not do so.  The fact that a statute creates procedural requirements that limit some potential claimants' participation in a suit, standing alone, is insufficient to toll the statute of limitations." *MacGregor v. Farmers Ins. Exch.*, 2011 WL 2731227, *1 (D.S.C. 2011) (cleaned up).  Accordingly, the inherent delay of ordinary motion practice and a reasonable amount of time for judicial resolution of a preliminary certification motion does not necessarily warrant equitable tolling.  But when the delay becomes too long, tolling may be warranted.

Plaintiffs filed the preliminary certification motion on July 11, 2024.  (Doc. 17.)  Under a typical briefing schedule, the motion would have been fully briefed by August 1, 2024.  Instead, the motion did not become fully briefed until September 12, 2024.  (Doc. 36.)  This six-week delay was the result of the Court granting Defendants' three unopposed motions to extend their response deadline.  (Docs. 20, 22, 30.)  The Court does not fault Defendants for seeking extensions and does not fault Plaintiffs for agreeing to them— "agreeing to reasonable requests to extend deadlines" is a "professional courtesy" that is "expected of attorneys" as a matter of "civility."  *Martin v. Pizza*, 2022 WL 4000640, *2 (D. Nev. 2022).  Nevertheless, the Court agrees with Plaintiffs that the potential opt-in plaintiffs should not suffer the consequences of additional delay caused by Defendants' extension requests, which resulted in an eight-week period of time for Defendants to respond, as opposed to the two-week period contemplated by the local rules.  (Doc. 36 at 10.)  Furthermore, the Court's resolution of the motion following full briefing has taken over three months, which is in the range that courts have determined to justify equitable tolling.  *Small*, 2013 WL 3043454 at *4.  Thus, the Court will equitably toll the statute of limitations for opt-in plaintiffs by 90 days to account for the six-week briefing delay and for the delay in judicial resolution of the motion.[6]

---

[6]    Defendants argue that Plaintiffs original request for equitable tolling was "pro forma."  (Doc. 34 at 20.)  But Plaintiffs could not have known, at the time they filed their motion, whether there would be subsequent delays in briefing and judicial resolution. Indeed, by the time Defendants filed their response, Defendants' three extension requests had created delay, which Plaintiffs addressed in their reply.  (Doc. 36 at 9-10.)

E.    **Plaintiffs' Proposed Notice And Consent Forms**

Plaintiffs attached their proposed notice and consent form to their motion.  (Doc. 17-3.)  Defendants had the opportunity, in their response brief, to make arguments opposing any portion of the notice or consent form they found objectionable.  Defendants did not do so.

Defendants rely on *Khadera v. ABM Indus. Inc.*, 701 F. Supp. 2d 1190 (W.D. Wash. 2010), for the proposition that the Court should order the parties to meet and confer to develop the notice and consent forms.  But in *Khadera*, the plaintiffs apparently did not draft proposed notice and consent forms and submit them with their preliminary certification motion, as Plaintiffs did here.  As a result, the court in *Khadera* ordered the plaintiffs to file a proposed notice, set a deadline for the defendants to oppose it, and encouraged the parties to meet and confer to determine whether they could provide a stipulated form.  *Id.* at 1197.  Here, Plaintiffs already filed their proposed notice and consent forms and Defendants had a full and fair opportunity to object.  There is no justification for further delay.  Plaintiffs' proposed notice and consent forms may be sent.

F.    **Contact Information And Third-Party Administrator**

Defendants "object to providing contact information to Plaintiffs' counsel and request[] that a third-party administrator be utilized to send any notice." (Doc. 34 at 22.) Defendants argue that Plaintiffs have "not explained why it would be preferable for them to oversee distribution of notice." (*Id.*)  But Defendants have not explained why it would be preferable for a third-party administrator to oversee distribution of notices.  Plaintiffs set forth a detailed notice plan (Doc. 17 at 14-17) and Defendants have offered no concrete objection to it.  Defendants have not raised any concerns that would warrant ordering that a third-party administrator send the notices.  *Houck v. Maricopa Cnty.*, 2023 WL 7018061, *5 (D. Ariz. 2023) ("Defendant has failed to identify dangers that will arise [from providing plaintiffs with opt-in plaintiffs' contact information].");  *Delara v. Diamond Resorts Int'l Mktg., Inc.*, 2020 WL 2085957, *7 (D. Nev. 2020) ("Diamond does not identify a need for a third-party administrator in this case, there is no reason to suspect Delara's counsel is

incapable of properly handling notice, and Delara's counsel has incentive to do it correctly.").

Accordingly, the Court will order Defendants to provide Plaintiffs with the requested contact information of potential opt-in plaintiffs—with one exception. Plaintiffs seek the last four digits of potential opt-in plaintiffs' social security numbers but "do not explain why a social security number is necessary to communicate with clients." *Gillespie*, 2023 WL 2734459 at *15. This request is unnecessarily intrusive on potential opt-in plaintiffs' privacy.

Accordingly,

**IT IS ORDERED** that Plaintiffs' preliminary certification motion (Doc. 17) is **granted**. The collective, as defined in this order, is preliminarily certified.

**IT IS FURTHER ORDERED** that Defendants shall, within 30 days of the date of this order, provide Plaintiffs with the following contact information for all current and former employees in the collective: (1) full name, (2) all known mailing addresses, (3) all known email addresses (work and personal), (4) employee identification number, if any, (5) dates of employment, and (6) all known phone numbers.

**IT IS FURTHER ORDERED** that notice shall be effectuated as set forth in Plaintiffs' motion. The collective members may execute their consent forms traditionally or electronically via DocuSign and/or Clio.

**IT IS FURTHER ORDERED** that the opt-in period shall be 90 days from the date on which Plaintiffs are provided with collective members' contact information. Plaintiffs may send one reminder notice to any collective member who has not returned an executed Consent to Join form to Plaintiffs' counsel after 60 days.

Dated this 23rd day of December, 2024.

Dominic W. Lanza
United States District Judge

- 21 -